**HEYER PRODUCTS COMPANY, Inc.,**
v.
**UNITED STATES.**
No. 96–55.

United States Court of Claims.
Oct. 7, 1959.

See also 135 Ct.Cl. 63, 140 F.Supp. 409.

Carl L. Shipley, Washington, D. C., for plaintiff. Shipley, Akerman & Pickett, Washington, D. C., were on the brief.

John F. Wolf, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Clare E. Walker, New York City, was on the brief.

WHITAKER, Judge.

Plaintiff's petition alleges that the defendant, through the Ordnance Tank Automotive Center, Ordnance Corps, Department of the Army, issued an invitation to it and to others to bid on 5,500 low voltage circuit testers; that it put in a bid of $205,975, which it says was the low bid, but that the contract was awarded to the Weidenhoff Company, whose bid was $190,043 higher. Under these facts, it alleges that it had a legal right to an award of the contract, and, hence, it is entitled to recover the expense it incurred in putting in its bid and its loss of profit.

■ Before going further, let us say that the only question with which we are confronted, of course, is whether or not plaintiff's rights have been violated, not whether or not the award of this contract was in the public interest. Even should we think the expenditure of the Government's money was wasteful and that proper care was not taken to protect the public treasury—upon which we express no opinion—that is beside the point in this case. Unless we find that plaintiff has been deprived of some right, it cannot recover, however improvident the Government's agents may have been.

In our former opinion on defendant's motion to dismiss, delivered on May 1, 1956, 140 F.Supp. 409, 135 Ct.Cl. 63, we held that plaintiff's petition contained sufficient allegations to make out a case of discrimination against it and of favoritism toward the successful bidder, and that, if the allegations were true, it would be impossible to conclude that that bid had been accepted which was most advantageous to the Government, as required by the Armed Services Procurement Act of 1947 (62 Stat. 21).[1] Nevertheless, we said that that act afforded plaintiff no basis for recovery of his loss of profits, because it was passed for the benefit of the Government, and not for the benefit of the bidder.

■ We add that plaintiff cannot recover its loss of profits on a contract implied in law, because Congress has not consented to suits on such quasi-contracts.

■ However, we said that by the solicitation for bids, the Government impliedly promised that it would give honest and fair consideration to all bids received and would not reject any one of them arbitrarily or capriciously, but would award the contract to that bidder whose bid in its honest judgment was most advantageous to the Government. If in the instant case the OTAC, in rejecting plaintiff's bid, did not act in good faith, but arbitrarily and capriciously, it breached its implied promise when it solicited bids, for the breach of which plaintiff may recover the expenses it had incurred in submitting its bid.

So the question before us is, was plaintiff's bid rejected in good faith or arbitrarily or capriciously? If its rejection was not fraudulent nor arbitrary nor capricious nor so unreasonable as to necessarily imply bad faith, plaintiff has established no right of recovery.

Defendant says it was rejected because the sample plaintiff submitted did not comply with the specifications. The invitation for bids provided:

"Bid sample *must* be furnished for test and evaluation.

\* \* \* \* \* \*

"(c) Item being furnished as same *must* conform in every respect to the item the facility intends supplying to meet the Government requirements.

"(d) Any sample failing in any portion of tests will be deemed sufficient basis for rejection."

It cannot be denied that plaintiff was a responsible contractor who had been in the business of manufacturing automotive test equipment for 25 years, and had manufactured thousands of low voltage circuit testers both for the Government and for such manufacturers as General Motors, Ford, Chrysler, Standard Oil, and others. This being so, if the

1. Now 10 U.S.C.A. § 2301 et seq.

sample it was required to submit with its bid complied with the specifications, there would seem to be no justification for rejecting its bid and awarding the contract to Weidenhoff, whose bid was almost twice that of plaintiff's. Defendant suggests no justification other than the failure of the sample to comply with the specifications. So, if the sample did comply with them, the conclusion must be that there was gross discrimination against plaintiff in favor of Weidenhoff, which would be a breach of the Government's implied promise that no bid would be arbitrarily rejected, and that that bid would be accepted which in the honest judgment of the awarding authority was most advantageous to the Government.

We proceed to inquire whether plaintiff's sample complied with the specifications. The defendant's agents and officials say it did not in several respects. These agents and officials are, first, the employees in the testing laboratory, second, a Mr. Ryff, the project engineer, third, a Mr. Newcomb, Chief of the Tools and Equipment Branch of the Procurement Division of the Ordnance Tank Automotive Center, who was Mr. Ryff's superior, and fourth, a Mr. Vogrin, who was the buyer in the OTAC assigned to procure these testers.

There were ten bids, but only six bidders submitted samples. Just before the invitations for bids were issued Mr. Ryff directed the testing laboratory to make certain specified tests to determine whether the samples to be submitted complied with the specifications.

Plaintiff complains that bidders were not notified, in advance of the bidding, of the tests to which the samples were to be put. Of course not. They were such tests as defendant deemed necessary to ascertain if the samples complied with the specifications. Even if the specifications had said nothing about tests, plaintiff should have known that they would be tested, and should have been glad to have them tested; but the specifications expressly said that they would be. All samples were put to the same test. No other bidder complained, so far as the record shows.

After the tests had been made, the laboratory reported that plaintiff's sample was defective in the following respects:

"1. Two of the terminal screws could be removed by hand (Fig. 2).

"2. Electrostatic effect was very bad on both meters. The meters did not recover except by breathing on the meter windows (Fig. 20).

"3. The voltmeter readings were more than 2% low (of full scale deflection) from 9 to 10 volts on the 0–10 volt range (Fig. 15).

"4. The voltmeter readings were more than 2% low (of full scale deflection) from 90 to 100 volts on the 0–100 volt range prior to tapping of the meter. This calibration data was obtained after the tester was subjected to the vibration test.

"5. The No. 8 cable failed the high temperature test (Table XII)."

Accompanying this report, and in support of it, were detailed reports of various tests made and a number of graphs and photographs.

Mr. Ryff, the project engineer, had been in daily contact with the laboratory while the tests of the several samples were being made and was kept informed of the results of them. Being fully apprised of the results of the tests, he did not await receipt of the written report from the laboratory before making his own report to his superiors. His report was not quite so succinct as the laboratory's, but the purport of it was the same as the later written report of the laboratory, so far as plaintiff's sample is concerned.

Mr. Ryff's report was approved by Mr. Newcomb and by the Major Awards Board.

The most serious of the defects listed is that the voltmeter readings were more than 2 percent low of full scale deflection at 9 to 10 volts on the 0–10 volt range, and that they were more than 2 percent low of full scale deflection from 90 to

100 volts on the 0–100 volt range. This means that in measuring a 9-volt current and a 10-volt current and also a 90-volt current and a 100-volt current, the meters registered inaccurately by more than 2 percent. The specifications in paragraph 3.1.13 provided:

"3.1.13 *Meters.*—One voltmeter and one ammeter shall be provided and securely attached to the instrument panel. The meters shall conform to specification JAN–I–6 and have movements suspended in jewel bearings and an overall accuracy within 2 percent of full scale deflection. The current requirements for full scale deflection of the meter needle shall be as specified in 3.1.13.5.1 and 3.1.13.5.2, and they shall be noted in a legible manner on the meter dial face."

█ It is apparent, then, that the samples submitted by plaintiff failed to comply in a vital respect with the requirements of the specifications. What the defendant ordered was something to determine the voltage of the current being transmitted. It wanted to know this accurately, but it had to know it within 2 percent of the exact amount. If what the plaintiff was supplying was inaccurate to a greater extent, it was of no use to the defendant because it did not measure the current accurately enough.

This certainly was sufficient ground to reject what the plaintiff offered to supply. The invitation for bids quoted above provides:

"Item being furnished as same [as the sample] *must* conform in every respect to the item the facility intends supplying to meet the Government requirements.

"Any sample failing in any portion of tests will be deemed sufficient basis for rejection."

Plaintiff does not deny that the sample, fully assembled, was inaccurate by more than 2 percent; but it says that if the meter had been tested before being assembled in the tester, with its accompanying shunts and multipliers, it would have stood the test, and that this was a compliance with the specifications. This is obviously specious. What the defendant wanted was a tester that would stand the accuracy test when put to the use defendant desired to make of it. It did not do this, as plaintiff admits.

This was the major defect in plaintiff's sample. But it was also defective in that one of the cables failed the high temperature test, and also in that the electrostatic effect was bad on both the voltmeter and the ammeter.

The cable in the sample of what plaintiff proposed to furnish was defective. This of course could be remedied by supplying a better cable. But this was a sample of the product plaintiff proposed to supply; if the sample was bad, defendant had reason to suspect that the products to be furnished would be bad. The invitation for bids notified the bidders: "Item being furnished as same [sample] *must* conform in every respect to the item the facility intends supplying to meet the Government requirements."

The same may be said of the fact that two of the terminal screws could be removed by hand. The defective cable indicated the use of poor material; the loose screws, poor workmanship.

The other defect noted by the laboratory was that the electrostatic effect was bad on both meters. Until this static electricity was drained off, the meters did not even approach a correct reading. It caused the needle on the dial to stick; so long as it was stuck, the meter either did not register at all, or else it registered abnormally, without any approach to accuracy. To get rid of this electrostatic effect, it was necessary to breathe on the meter windows. The specifications provided:

"3.1.13.2 *Transparent front.*—The meter shall be provided with a glass or other transparent window which shall be shatterproof and free of discoloration, scratches, striae, and electrostatic effect."

It seems obvious to us that OTAC was fully justified in rejecting plaintiff's bid for the failure of its sample to comply with the specifications. Certainly its rejection was not arbitrary or capricious or in bad faith. Since it was not, plaintiff is not entitled to recover, whether or not defendant was justified in letting the contract to Weidenhoff.

This being true, it is not incumbent on the defendant in this action to justify letting the contract to Weidenhoff. However, a word might be said about that, since plaintiff vigorously asserts that favoritism was shown Weidenhoff, and that the defendant did not act in good faith in awarding the contract to it. Although plaintiff has no standing to complain of the award of the contract to another bidder, we think the vigor with which this case has been prosecuted by plaintiff and defended by the Government entitles the parties to an expression of our views on the *bona fides* of the award to Weidenhoff.

Plaintiff says, if it be admitted that its sample did not comply with the specifications, Weidenhoff's did not do so either. Defendant says it did.

Weidenhoff's sample passed the accuracy tests, which, it appears to us, is the prime consideration. But the testing laboratory found that the electrostatic effect on both the voltmeter and the ammeter was bad. As stated above, this causes the needle on the meter dial to stick and the meter to fail to register, at least accurately. This would be a serious defect, except for the further statement of the testing laboratory, that "both meters recovered quickly." We take this to mean that you had to wait a moment for the electrostatic effect to disappear, after which the meters registered accurately. It would have been better to have had no electrostatic effect at all, but we understand it is very difficult to completely eliminate it. The next best thing would seem to be the prompt disappearance of this extraneous force, after which the meters registered accurately.

Mr. Ryff, the project engineer, and his superiors thought this was substantial compliance with the specifications. We cannot say they were wrong.

The other defect in the Weidenhoff sample noted by the testing laboratory was: "The sensitivity of the movement of the ammeter was 39.07 for full scale deflection; with a 3 ohm series resistor, the sensitivity was 57.45 mv. for full scale deflection (Table VI)."

The specifications, in paragraph 3.1.13.5.1, set forth the details for the ammeter dial. Among other things it said: "Full scale deflection shall be 50 millivolts which shall be noted on the face of the dial as F.S.–50 M.V."

We interpret this to mean that a meter of 50 millivolts full scale deflection is one which would require the passage through it of a current of 50 millivolts to attain full scale deflection. This is indicated by paragraph 3.1.13 quoted above, which deals with "meters". It says: *"The current requirements for full scale deflection of the meter needle shall be as specified in 3.1.13.5.1 and 3.1.13.5.2 * * "* [Italics ours.] One that required a greater voltage than 50 millivolts would be less sensitive than the one specified; one that required less voltage would be more sensitive.

Two of the samples tested were just about on the mark: plaintiff's required 49.25 millivolts, and another, 49.75. One sample required 52.675; it was the least sensitive. Weidenhoff's required only 39.07; it was the most sensitive. This means it would register current when the others would not.

What is the significance of this variance in the sensitivity of Weidenhoff's meter? The record does not provide an answer, except that it seems to have had no effect on the accuracy of the meter's measurement of amperage. The tests showed that it measured it accurately, notwithstanding this variance. If it did not affect the meter's accuracy, this excess sensitivity would seem to be an immaterial variance from the requirements of the specifications.

The testing laboratory did not comment on the significance of the excess sensitivity; it merely reported the facts. Mr. Ryff, the project engineer, who did evaluate the tests, did not comment specifically on it; but he did say the Weidenhoff sample "successfully passed all tests."

Had the Weidenhoff meter been less sensitive than the specifications required, this might have been a material variance, but we ourselves do not see how greater sensitivity would make any difference. So far as we can see, the requirement of 50 millivolts for full scale deflection was a minimum requirement and not an exact requirement. If it was an exact requirement, the record discloses no reason why it had to be exact.

We cannot say that Ryff's conclusion that the Weidenhoff sample "successfully passed all tests" was wrong; nor can we say that this statement was not made in good faith.

These were the only two defects in the Weidenhoff sample noted by the testing laboratory.

In conclusion the testing laboratory said:

"Conclusions:

"1. Tests on low voltage circuit testers 'B', 'E' and 'F' were either discontinued, or were not conducted, at the request of the project engineer.

"2. Based upon the tests conducted in accordance with the Test Program and the amendments, the remaining low voltage circuits testers are listed below in the order of over-all performance;

"a. 'C'

"b. 'A' and 'D', etc."

(Code C Tester was Weidenhoff's; "A" was plaintiff's; "D" was that of another bidder. The laboratory was not given the names of the bidders submitting the several samples.)

The laboratory did not say that the Weidenhoff sample met the specifications, but they did say in overall performance it was better than the other two samples tested.

There is not the slightest indication in the record that the report of the testing laboratory was not purely scientific and objective and unbiased.

Plaintiff complains that the specifications accompanying the invitation for bids had been prepared by OTAC in collaboration with the Weidenhoff Company. There was nothing sinister about this. Weidenhoff had just completed furnishing a lot of testers for the OTAC, which had proven satisfactory. OTAC wanted to procure more of them. The manufacturer who had been making these satisfactorily best knew what it took to produce a satisfactory article. It was sensible and proper for OTAC to enlist its aid in describing to the trade just what OTAC wanted. Before invitations for bids were sent out, OTAC sent the proposed specifications to plaintiff and other prospective bidders for their comment. Plaintiff studied them and commented on them.

It was not taken by surprise by the contents of the specifications accompanying the invitation for bids, including the requirement for the furnishing of a sample. Plaintiff itself had previously urged that bidders be required to submit samples. Plaintiff had been one of the bidders on a procurement in 1950 of low voltage circuit testers. In 1951, a year before the invitation for bids for the circuit testers here involved was issued, plaintiff learned OTAC would need additional circuit testers; whereupon it began perfecting its drafting material and began preparation of a sample unit. Plaintiff had ample opportunity to prepare the best sample it could. The only advantage Weidenhoff had was that it had actually manufactured these testers in quantity. This of course was a material advantage, but it was unavoidable; it was not brought about by manipulation of OTAC.

Weidenhoff's bid was nearly twice the amount of plaintiff's bid, but that does not necessarily show that it was exorbi-

tant. There were three bids higher than Weidenhoff's. The bid of the General Electric Company was considerably more than twice as high, and the other two were respectively 27 percent and 16 percent higher.

We cannot say that OTAC did not act in good faith in deciding that Weidenhoff's bid was the one most advantageous to the Government. Certainly, we cannot say that the rejection of plaintiff's bid was arbitrary or capricious or lacking in good faith.

It results that plaintiff's petition must be dismissed.

It is so ordered.

FAHY, Circuit Judge, sitting by designation, JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.