Collins, Judge,
delivered the opinion of the court:
This action and Coastal Cargo Co. v. United States, ante, p. 259 which was also decided today, are based, to a considerable extent, upon the same set of facts. In September 1958, the Department of the Air Force awarded to Coastal Cargo Co. (hereinafter “Coastal”) a contract for certain airlift services. Subsequently, in December 1958, the General Accounting Office ruled that the award to Coastal had violated the applicable procurement regulations. As a result, on December 18, 1958, the Air Force canceled its contract with Coastal and awarded to Los Angeles Air Service, Inc. (hereinafter “Los Angeles”), a contract for the remaining air transportation service. After the commencement of the present suit, the name of Los Angeles was changed to “Trans International Airlines, Inc.”
Plaintiff is asserting three different claims, the first of which is premised upon the illegality of the award to Coastal. The latter company performed the contract for a period of approximately 21/2 months. Plaintiff seeks to recover (1) the “standby” and maintenance costs which it incurred prior to its receipt of the contract and (2) the profits anticipated by plaintiff for the 21/2 months when Coastal was performing. In effect, plaintiff asks us to adopt the ruling of the General Accounting Office that the award to Coastal was invalid.
In answer to plaintiff’s contentions, it is sufficient to refer to the conclusion which we reached in the companion case, Coastal Cargo Co. v. United States, supra. There, we de *314 termined that the award to Coastal had been in compliance with the pertinent regulations, and we held that Coastal was entitled to recover for the termination of its contract. It follows, therefore, that any claim of the present plaintiff which is founded upon the invalidity of the award to Coastal must fail.
Our decisions in Heyer Products Co. v. United States, 135 Ct. Cl. 63, 140 F. Supp. 409 (1956); 147 Ct. Cl. 256, 177 F. Supp. 251 (1959), are of no avail to plaintiff. At 135 Ct. Cl. 63, 68, we stated the following general rule:
It has been settled beyond controversy that most statutes governing the awarding of bids by governmental agencies are enacted for the benefit of the public who are served by these agencies, and not for the benefit of the bidders, and, therefore, that bidders have no right to sue on the ground that the provisions of such an Act have been violated, in that the contract had not been let to the lowest bidder. * * * [Citations omitted.]
Thus, we concluded that the plaintiff, whose bid had been rejected, could not recover anticipated profits. Nonetheless, the Government’s motion to dismiss was denied, since the plaintiff had alleged (1) that the invitation for bids had not been issued in good faith and (2) that its bid had not received fair consideration. 135 Ct. Cl. 63, 71. Our opinion stated that, if Heyer could prove its allegations, then Heyer would be entitled to recover the expense of preparing its bid.[1]
The instant case is clearly distinguishable from the situation alleged in Heyer Products Co. v. United States, supra. In the present case, there was neither bad faith nor arbitrariness on the part of the contracting officer. We have found, to the contrary, that award of the contract to Coastal was a proper action. Therefore, as to the period prior to December 18, 1958, plaintiff was merely an unsuccessful bidder, and there is no basis for any recovery by plaintiff with regard to that period.
The fact that plaintiff’s first claim must be denied does not in itself mean that recovery on the remaining claims is pre *315 cluded. Count two of the petition states that for the period December 19 through December 31, 1958, the Government did not meet its alleged guarantee to pay for 86 passengers per flight. During December, plaintiff made four one-way flights and was paid on the basis of 72 passengers per trip. The actual number of persons carried' was, in each instance, less than 72.
According to plaintiff, the contract obligated the Government to pay, with respect to each flight, the price for transporting plaintiff’s mean available cabin load (ACL) of 86 passengers,[2] regardless of the number actually carried. Plaintiff asserts that this guarantee was confirmed in. the January 6, 1959, telegram sent by the contracting officer. (See finding 42, infra.) Finally, plaintiff urges that, if there is any ambiguity as to the guarantee of payment, the doubt must be resolved against the Government. Plaintiff cites, for example, Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390, 418 (1947), in which this court stated:
* * * Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. * * *
"With regard to the instant case, we have no difficulty in ascertaining the intent of the parties.
It is axiomatic that, in order to determine the meaning of a contract, one must look to the entire instrument. E.g., Jansen v. United States, 170 Ct. Cl. 346, 356, 344 F. 2d 363 (1965). Here, any possible uncertainty created by the guarantee provisions of the invitation for bids or by the post-December telegram is quickly dispelled when the contract as a whole is considered. First, it is undisputed that the parties agreed that, during December, plaintiff would transport 144 (round trip) passengers. Second, the award stated the precise sum which would be payable to plaintiff *316 and this included, for December, an amount computed on the basis of 72 passengers per flight.[3] This specific agreement as to the amount payable to plaintiff is controlling. Cf. Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 396, 351 F. 2d 972, 980 (1965); Callahan Constr. Co. v. United States, 91 Ct. Cl. 538, 634 (1940). Plaintiff received the full contract price, and it is entitled to no more.
In count three of the petition, plaintiff alleges that, between December 23, 1958, and August 1959, it was denied the right to purchase aviation fuel and oil from the Air Force. Plaintiff asks that it be awarded the difference between (1) the higher rates paid to commercial suppliers and (2) the prices charged by the Air Force.
Effective December 23, 1958, the pertinent Air Force regulation was amended so as to permit companies, such as plaintiff, which were under contract to the Government to purchase Air Force fuel and oil even though commercial products were available. The facts regarding plaintiff’s efforts to take advantage of the new policy are set forth in findings 56-62, infra.
Plaintiff asserts that, after the amendment of the regulation but prior to August 1959, it requested permission to make purchases from the Air Force at Charleston Air Force Base. However, the findings of our trial commissioner do not support plaintiff’s contention, and we have adopted these findings. The regulation in question, AFP 67-53, was not self-executing. If plaintiff wished to obtain the benefits of the regulation, it was incumbent upon plaintiff to make a *317 request of the proper air base authority. Since plaintiff failed to do so until August 1959, we hold that its claim must be denied.
In conclusion, plaintiff is not, with regard to any of the three counts, entitled to recover. Therefore, the petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
Count I
1. Plaintiff, Trans International Airlines, Inc. (formerly Los Angeles Air Service, Inc.), is a small business firm within the meaning of the Small Business Act, incorporated under the laws of the State of California, and engaged in the business of air transportation of passengers and cargo in interstate and foreign commerce, with its base of operations at Hawthorne, California.
2. In the summer of 1958, Congress appropriated a large sum of money for procurement of commercial airlift services by the Air Force. About that time the commercial airlift procurement work was transferred from the Air Materiel Command (AMC) at Wright-Patterson Air Force Base, Ohio, to Headquarters, Military Air Transport Service (MATS) at Scott Air Force Base, Illinois, and certain AMC personnel were transferred to Scott to handle this procurement work. However, MATS had only been granted approval authority for contracts under $350,000, and any contract in excess of $350,000 had to be approved by AMC.
3. At Scott the MATS chain of command for procurement work was as follows:
Deputy Chief of Staff for Materiel (DCS/M) — General Light
Asst. Deputy Chief of Staff for Materiel — Colonel Sloan (acting DCS/M in General Light’s absence)
Chief of Procurement Division — Colonel Sherman
Chief of Contract Airlift Section — Lt. Colonel Bores
Contracting Officer — Robert F. Hinger
*318 4. After the transfer of commercial- airlift procurement work to Scott, a permanent Commercial Airlift Capability Survey Committee was established to evaluate the capability of bidders and to report its evaluations to the contracting officer for his decision. Colonel Sloan was the Chairman of the Capability Survey Committee.
AMC had a Facility Capability Committee which issued Facility Capability Reports on bidders, but the Facility Capability Report procedure applied primarily to manufacturing activities, whereas the MATS Capability Survey Committee procedure was set up strictly for commercial airlift procurements. The Capability Survey Committee procedure at MATS was mandatory, and the contracting officer could not take any action until he received the findings and recommendations of that committee.
5. The purpose of the Capability Survey Committee was “to evaluate the capabilities and qualifications of proposed commercial airlift contractors.” Its procedures were set forth in instructions, dated July 24, 1958, which provided as follows:
a. Prior to the award of a contract to a prospective airlift contractor the chairman of the committee may call upon the designated members to evaluate the capabilities of the prospective contractor. The evaluation will consist of but will not be limited to past performance; financial resources; equipment; personnel; technical know-how; maintenance capability and support capability. If an actual facility survey is required as the result of this initial evaluation, the chairman will direct designated members to perform an evaluation of the prospective contractors’ facilities. The survey will consist of but will not be limited to inspecting the quality of workmanship (maintenance); minimum, maximum, current and potential capabilities, financial prospectives, plant layout for maintenance of aircraft, condition of aircraft to be under the performance of the proposed contract, condition of ground handling equipment, and such other items that affect carrier capability.
6. On August 13, 1958, MATS issued Invitation for Bids (IFB) 11-626-59-3 CAB for 13 items of overseas passenger and cargo airlift services for the period October 1, 1958, to September 30, 1959. Items 6, 7, 8, and 9 of this IFB were *319 set aside for awards to small business firms only, pursuant to 10 TT.S.C. § 2304(a) (1) and sections 1-706.7 and 3-201.2 (b) (ii) of the Armed Services Procurement Regulations. This was the first airlift procurement program regarding which MATS had provided a “set-aside” for small business firms.
. Item 7 was for the transportation of 500 passengers per month, round trip, from Charleston Air Force Base, South Carolina, to Nouasseur, Morocco. Items 6, 8,. and 9 related, to different destinations and to different points of origin.
7. The IFB provided that bids were to be submitted by September 2,1958, and would be opened that day. Bid opening was later postponed until September 4,1958. The procurement plan for the IFB estimated the date of award as September 15,1958. Los Angeles submitted bids on Items 7 and 9, and another small business firm, Coastal Cargo Company, Inc. (plaintiff in the companion case, Ct. Cl. No. 467-59, hereafter referred to as Coastal), submitted bids on Items 6 and 7.
When bids were opened on September 4, 1958, the lowest bids received on Items 6, 7, 8, and 9 were as indicated in the following tabulation:

Item 6:

(1) Universal Airlines (SSW, Inc. d/b/a), Burbank, California. $157.87 per round trip passenger.
(2) Capitol Airways, Inc., Nashville, Tennessee. $167.14 per round trip passenger.
Item 7/
(1) General Airways, Portland, Oregon. $206.19 per round trip passenger.
(2) Los Angeles Air Service, Inc., Hawthorne, California. $215.08 per round trip passenger.
(3) Universal Airlines (SSW, Inc. d/b/a), Burbank, California. $218.70 per round trip passenger.
(4) Coastal Cargo Co., Inc., West Trenton, New Jersey. $222.90 per round trip passenger.

Item 8:

(1) Slick Airways, Inc., Burbank, California. $320.16 per round trip passenger.

Item 9:

(1) Los Angeles Air Service, Inc., Hawthorne, California. $349.62 per round trip passenger.
(2) Slick Airways, Inc., Burbank, California. $378.88 per round trip passenger.
*320 ' 8. On the day bids were opened, Mr. Hinger, the contracting officer, requested the Capability Survey Committee to determine if the low bidder on each item was capable of performing, and, if the capability of the low bidder was questionable, to evaluate the second low bidder. For Item 7, the names of General Airways and Los Angeles were submitted to the committee, and for Item 9, the names of Los Angeles and Slick Airways.
Upon receiving the request from the contracting officer, the Capability Survey Committee met on September 4, 1958, and organized four teams to visit the different bidders.
9. Los Angeles and Universal Airlines were each surveyed on September 7 and 8, 1958. General Airways was surveyed at approximately the same time. During the second week of September 1958, a survey was made of Coastal.
' The teams submitted their findings to the Capability Survey Committee which then met to make findings and recommendations to the contracting officer.
10. The Capability Survey Committee held a meeting which began during the afternoon of September 10,1958, and continued until the morning of September 11, 1958. In a report dated September 11, 1958, the committee found that Los Angeles was not capable of performing because of (1) its financial condition, (2) no record of performance by the bidder with the type of aircraft upon which the bid was based, and (3) failure to establish possession or control of necessary maintenance spares or back-up capability. The committee recommended that the'bids of Los Angeles on Item 7 and Item 9 be rejected. On the same day, the committee determined that General Airways and Universal were not capable of performing and recommended injection of their bids. These recommendations were accepted by the contracting officer.
11. Section 1-705.6 of the Armed Services Procurement [Regulations (ASPE), revised June 11,1958, provided as follows :
1-705.6 Certificates of Competency.
(a) SB A has the statutory authority to certify the competency of any small business concern as to capability (see ASPE 1-307 (iii) and (iv)) and credit (see ASPE *321 1-307 (ii)). Contracting officers shall accept SBA certificates of competency as to capacity and credit as conclusive ; provided, if the contracting officer has substantial doubts as to the firm’s ability to perform, he shall prior to award refer the matter to higher authority in accordance with Departmental procedures.
(b) If a small business concern has submitted an otherwise acceptable bid or proposal but has been found by the contracting officer to be nonresponsible as to capacity or credit, and if the bid or proposal is to be rejected for this reason alone, (i) SBA shall be notified of the circumstances so as to permit it to issue a certificate of competency, and (ii) award shall be withheld pending either SBA issuance of a certificate of competency or the expiration of ten working days after SBA is so notified, whichever is earlier; subject to the following:
(A) this procedure is mandatory except where the contracting officer certifies in writing that award must be made without delay and inserts in the contract file a statement signed by the contracting officer justifying the certificate;
(B) this procedure does not apply to proposed awards of not more than $1,000; and
(C) this procedure is optional, within the discretion of the contracting officer, as to proposed awards of more than $1,000, but less than $10,000.
The Air Force Procurement Instructions (AFPI), revised April 22, 1958, pertaining to Negative Facility Capability Reports on Small Business Concerns, provided, in section 52-109 (f), a mandatory procedure for referring small business concerns to the Small Business Administration for a certificate of competency, with the following exception:
(5) The procedures outlined above are mandatory except where the award must be made without delay (see ASPR 1-705.6 (b) (A)). In such case the contracting officer will:
(A) Make a written certification and justification for awarding the contract without delay.
(B1 Place the certification in the contract file.
(C) Notify the AF small business specialist at the procuring location that the award must be made without delay and that he is proceeding with the procurement.
12. During the meeting of the Capability Survey Committee on September 10-11, 1958, a question arose about the *322 submission of these small business bidders to the Small Business Administration (hereafter referred to as SBA) for a determination of competency as to capacity and credit. Prior to that time, Colonel Sloan, the chairman of the Capability Survey Committee, was not aware of the requirements of the small business regulations. By this time the Capability Survey Committee had reached an impasse, because the target date for awards was September 15,1958, and the SBA procedure for processing certificates of competency required about 10 working days. An exception to the requirements of the applicable regulations in situations of urgency was pointed out by Colonel Adams, who read the appropriate provisions of the regulations aloud to members of the committee,, to Mr. Hinger, and to Captain Horn, the MATS Executive for Small Business. The Capability Survey Committee informally recommended to Mr. Hinger, the contracting officer, that the rejected low bidders not be referred to SBA. Mr. Hinger then announced that he had decided to (1) find that a condition of urgency existed, (2) issue a certification to that effect, and (3) proceed with the procurement without referring the matter to SBA for its determination.
13. The “urgency” involved in this procurement problem arose because of lack of adequate time to complete the usual procedural requirements by the target date. This was a highly compressed procurement assignment timewise, because (1) the issuance of the IFB was delayed by late passage of the appropriations bill, (2) the Air Force desired the airlift services to begin by October 1, 1958, and (3) a large volume of work was required in processing such procurement, involving approximately $4-7 million. Because of the delays and the shortness of time, there were discussions of starting the contracts later or handling the passenger service for an additional month on a call basis or by use of MATS planes, but none of these alternatives was adopted. The urgency pertained to the procurement as a whole and was not limited to any specific item or items.
14. On September 12, 1958, the Capability Survey Committee met, found that Coastal was capable of performing, and recommended that Item 7 be awarded to Coastal.
*323 15. After the Capability Survey Committee’s findings and recommendations were made to the contracting officer, much work remained to be done before submission to and approval hy AMC.
16. The proposed contracts were taken to AMC for approval in two groups, the “large packages” (larger awards, non-small business items) of this procurement going first and the “small packages” (smaller awards, small business “set-aside” items) going to AMC about a week later. The larger awards were approved and returned from AMC on Friday, September 12, 1958.
17. On or about Monday morning, September 15, 1958, Colonel Sloan and Mr. Iiinger took the second group of proposed contracts to AMC.
Before being sent to the AMC Procurement Committee, a proposed contract had to be given financial clearance at AMC. The AMC Financial Office denied financial clearance for Los Angeles on September 16,1958, for Item 9 for the estimated amount of $6 million. The request for financial clearance on Coastal for Item 7 for the amount of $1.3 million was approved by AMO on September 17, 1958.
18. The award on Item 9 to Slick Airways was publicly announced on September 16, 1958, and on the next day, Los Angeles protested to MATS that it had been improperly eliminated on grounds of financial incapacity. On September 18, 1958, a Los Angeles representative conferred with Lt. Colonel Bores and showed him a statement from the Bank of America guaranteeing the president of Los Angeles a loan of $1 million, but he was told that the award had already 'been officially made. On that same day, the Comptroller’s Office at MATS reevaluated the financial capability of Los Angeles with respect to Item 9 and again concluded that Los Angeles was not financially capable of performing.
19. On September 18, 1958, the contracting officer notified Coastal by telegram that it was the low bidder on Item 7 and that the official award would be forwarded as soon as necessary approvals were received. On the same day, Coastal began its preparations to perform. On September 22,1958, Coastal received an award dated September 16,1958, for air transportation of 500 passengers per month, October 1,1958, *324 to September 30, 1959, round trip, from Charleston, South Carolina, to Nouasseur, Morocco, at $222.90 per round trip passenger, for a total amount of $1,337,400.
General Airways, the first low bidder on Item 7, had been rejected because of its prior performance record on another contract; Los Angeles, the second low bidder, had been rejected principally for inadequate finances; Universal, the third low bidder, had been rejected for inadequate finances.
20. Thereafter, Los Angeles contacted members of Congress with respect to the appropriate procedures to be followed in making a formal protest. On September 23, 1958, Los Angeles filed a protest with the General Accounting Office (hereafter referred to as GAO) in regard to the award of Item 9 to Slick Airways, the second low bidder. This protest was also treated as a protest in regard to Item 7. The next day Universal filed a protest with the GAO in regard to the awards of Item 6 to Capitol Airways and Item 7 to Coastal. ‘ General Airways also filed a protest with the GAO in regard to Item 7. These protests were referred by the GAO to the Department of the Air Force for reports.
21. About the same time, the Department of the Air Force in Washington, D.C., was receiving complaints that applicable small business procedures had not been followed by MATS. These complaints were made to Mr. Gilbert C. Greenway, the Deputy for Air Transportation in the Office of -the Assistant Secretary of the Air Force for Materiel. Mr. Greenway became concerned when definite allegations were made that small business procedures had not been followed and that a document might be missing.
22. Mr. Greenway communicated his concern to Mr. Max Golden, then the Deputy Assistant Secretary for Materiel, and shortly thereafter the General Counsel of the Air Force. Mr. Golden was quite concerned about the charges that (1) the files had been “stuffed” or (2) there was some irregularity with respect to the Small Business Administration procedures. At that time, the Department of the Air Force was unaware that the subject of capacity and credit of the small business firms had not been referred to SBA. It was decided that the MATS procurement people should be brought to Washington to explain the situation. On September 25, *325 1958, Mr. Greenway telephoned Colonel Sloan and told him to come to Washington for a conference the next day.
23. After receiving the call, Colonel Sloan held a meeting in General Light’s office. Colonel Sherman, Lt. Colonel Bores, Mr. Hinger, and Colonel Adams attended the meeting.
At the meeting, Colonel Sloan and Lt. Colonel Bores learned that the certificate of urgency was not in the files at that time.
After the meeting and before the flight to W ashington that evening, September 25, 1958, Mr. Hinger prepared a certificate of urgency, backdated it September 14,1958, and placed it in the contract files.
24. The following day, the conference was held in Washington, attended by Colonel Sloan, Lt. Colonel Bores, and Mr. Hinger from Scott, and by Mr. Golden, Mr. Greenway, a Lieutenant Landau from the Air Force General Counsel’s office, and one or more other persons from the Air Force headquarters.
During the conference on September 26,1958, Mr. Golden and Mr. Greenway learned that the MATS procurement officials had not applied to SBA for certificates of competency for the small business firms, whose bids were rejected for lack of capacity and credit. Mr. Golden was told that a certificate of urgency had been executed and filed and that the applicable regulations had therefore been complied with. Mr. Hinger indicated to Mr. Golden that the certificate was not backdated.
25. At the conclusion of the conference, Mr. Golden directed Lieutenant Landau to prepare a draft of a report to GAO with regard to the protest of Universal. Colonel Sloan, Lt. Colonel Bores, and Mr. Hinger were directed to assist Lieutenant Landau. The completed report, which was dated September 29, 1958, and which was signed by the Assistant Secretary of the Air Force stated, inter alia, that:
Our normal procurement procedures, as set forth in Section 1-705.6 of the Armed Services Procurement Regulation provide that when the bid of a small business is rejected on the basis that the company lacks capacity or capability to perform, the Small Business Administration will be notified and award will be withheld pend *326 ing issuance by the SBA of a certificate of competency or the expiration of ten business days. ASPE 1-705.6 (b) (A) recognizes, however, that it may not be feasible to follow this procedure when award must be made without delay and authorizes the waiver of this procedure by the contracting officer upon his executing a certificate justifying his action. In the present procurement the contracting officer determined that the awards could not be delayed for the time required by this procedure, and on 14 September 1958 executed the necessary certificate setting forth the reasons for his determination. * * *
26. On October 3,1958, another report was made to GAO in regard to Los Angeles’ bid on Items 7 and 9. That report contained the same statement in regard to the certificate of urgency as the previous report on Universal’s protest and was based upon the same information obtained at the September 26 conference.
27. In the meantime, GAO had received allegations about irregularities in the MATS procurement program and had initiated an investigation.
The GAO investigation 'began at Scott on October 3,1958. The GAO investigator commenced by reviewing all the contract files on this IFB, with particular attention to Items 6, 7, 8, and 9. The investigator found signed carbon copies of the certificate of urgency in the contract files on Items 6,7, 8, and 9, but no other writings.
28. On Monday, October 6, 1958, the GAO investigator received from Washington certain protest letters from various rejected bidders, and the report dated September 29, 1958, from the Air Force on Universal’s protest.
29. Not having yet located the original copy of the certificate of urgency, the GAO investigator first interviewed Mr. Hinger on Tuesday, October 7, 1958. The original of •the certificate of urgency was located in a correspondence file.
30. On the basis of two interviews, the GAO investigator prepared an affidavit for Mr. Hinger’s signature. The affidavit which was executed by Mr. Hinger on October 8, 1958, stated, inter alia, that:
(7) The certificate [of urgency] was prepared and executed after award of contracts AF ll(626)-74 and AF 11 (626)-75. During period September 14 through Sep *327 tember 19, 1958, I made at least two trips to Air Materiel Command, Wright-Patterson AFB, Ohio. I arrived bach from Wright-Patterson Field late at night of September 19th or early morning of September 20th 1958 and at that time I had not prepared the certificate. I did not discuss the need for a certificate while at Wrighit-Patterson AFB.
(8) The date of 14 September 1958 appearing on the certificate is retroactive in the sense that a handwritten draft was prepared after award of contracts AF 11 (626)-74 and 75. I arrived at the determination to issue a certificate of urgency about 10 September 1958, but this determination was not reduced to writing, even a long-hand draft, until 25th September. * * *
31. The GAO investigator submitted a report of his investigation and the information was transmitted to the General Counsel of GAO in Washington.
32. The Air Force Inspector General’s Office also investigated this procurement and the subject of a certificate of urgency. As a result of the Air Force Inspector General’s investigation, Colonel Sloan, Lt. Colonel Bores, and Mr. Hinger received reprimands from the Commanding General at Scott Air Force Base.
33. By decisions dated October 24, 1958, GAO advised the Air Force that Los Angeles and Universal were entitled to a determination of their capacity and credit by SBA prior to rejection of their bids, and that SBA’s concurrence in the validity of the awards under Items 6,7, and 9 would depend upon whether these bidders were fomid by SBA to have been entitled to certificates of competency. The decision in the Los Angeles case referenced the decision in the Universal case.
In its opinion regarding Universal, the GAO stated that, sinca the contracting officer had not executed the certificate until after making the awards, he had violated the applicable regulations.
34. The October 24,1958, GAO decision directed Los An-geles to furnish the Air Force information relative to its capacity and credit as of September 16,1958 (the date of the award to Coastal), so the contracting officer could forward such information to SBA for a determination as to a certifi *328 cate of competency. GAO directed Los Angeles to submit such data, because the evaluation of its facilities was apparently based to some extent upon the facilities of another company, the Capability Survey Committee having erroneously reported that Los Angeles owned helicopters. Los Angeles complied promptly.
On November 4, 1958, the MATS Comptroller’s Office reviewed the financial status of Los Angeles to perform Item 9 and advised Colonel Sloan, the Chairman of the Capability Survey Committee, that, based on the additional information, it was the Comptroller’s opinion that Los Angeles would be capable of performing Item 9.
35. By reports dated November 5, 1958, Mr. Hinger requested SBA to determine the capability and credit of Los Angeles and Universal and these reports were forwarded to SBA on November 10,1958. SBA surveyed the facilities of Los Angeles and Universal, and on November 25, 1958, advised the Air Force that it would have issued certificates of competency for these bidders had the question been referred to it prior to September 16, 1958, and that as of the current date, the bidders were competent as to capacity and credit, Los Angeles with respect to requirements under Item 7, and Universal for Item 6.
36. On November 26, 1958, the day following the SBA determination, the Air Force raised an issue with GAO as to the responsiveness of the bids submitted by Universal and Los Angeles hi regard to Civil Aeronautics Administration (CAA) operating certificates for DC-6 aircraft which they planned to operate. By decision dated December 9, 1958, GAO rejected the claim of the Air Force regarding non-responsiveness.
37. The decision of GAO concluded:
* * * that rejection of the bids submitted by Universal Airlines on Item 6 and Los Angeles Air Service on Item 7 was erroneous and that the contracting officer was, therefore, without authority on September 16 to award contracts based upon higher bid prices on these items to Capitol Airways, Inc., and to Coastal Cargo Company, Inc. * * *
GAO directed cancellation of the prior awards on Items 6 and 7.
*329 38. On December 9, 1958, GAO rejected the protest of General Airways as to Item 7, upholding the rejection hy MATS of the bid of General Airways because of prior unsatisfactory performance of other contracts.
39. On December 15, 1958, SBA advised the Air Force that Los Angeles was certified as competent at that time'with respect to capacity and credit to perform the remaining portion of the procurement under Item 7. Because of recent adverse changes in the financial status of Universal, SBA declined to issue a certificate of competency to that company for Item 6. Since Universal was not granted a certificate of competency by SBA, the award to Capitol Airways under Item 6 was not canceled. Since Los Angeles was not granted a certificate of competency as to Item 9, the award to Slick Airways under Item 9 was not canceled.
40. (a) On December 18, 1958, Mr. Hinger sent Coastal a telegram, stating:
IN ACCORDANCE WITH COMPTROLLER GENERAL’S DECISION NUMBER B — 137471 AND B-137482, DATED 9 DECEMBER 19 58, AND LETTER EROM SMALL BUSINESS ADMINISTRATION DATED 15 DECEMBER 1958, THE AWARD TO TOUR COMPANT, COASTAL CARGO COMPANT, INC., OE ITEM NO. 7 OE IEB 11-626-59-3 CAB, IS HEREBT CANCELLED EFFECTIVE 18 DECEMBER 1958.
(b) On the same day, the contracting officer notified Los Angeles by telegram as follows:
IN ACCORDANCE WITH COMPTROLLER GENERAL’S DECISION NUMBER B — 137471 AND B-137482 DATED 9 DECEMBER 1958, AND LETTER EROM SMALL BUSINESS ADMINISTRATION DATED 15 DECEMBER 1958, TOUR COMPANT, LOS ANGELES AIR SERVICE, INC., IS HEREBT AWARDED ITEM 7 OE IEB 11-626-59-3 CAB EEEECTTVE AS OE THE DATE OE 19 DECEMBER 1958. AWARD FOR MONTH OE DECEMBER 1958 IS FOR THE AIR TRANSPORTATION OE 144 PASSENGERS, EROM CHARLESTON AIR FORCE BASE, SOUTH CAROLINA, TO NOUASSEUR, MOROCCO, AND RETURN, AT THE ROUND TRIP RATE OE $215.08 PER PASSENGER. AWARD FOR MONTHS OE JANUARY 1959 THROUGH SEPTEMBER 1959 IS FOR THE AIR TRANSPORTATION OE 500 PASSENGERS PER MONTH EROM CHARLESTON AEB, SOUTH CAROLINA, TO NOUASSEUR, MOROCCO, AND RETURN, AT THE ROUND TRIP RATE OE $215.08 PER PASSENGER. EXECUTED CONTRACT WILL BE FORWARDED TO YOU UPON OBTAINING NECESSARY APPROVALS.
*330 41. In January of 1959, Los Angeles proposed that the Air Force exercise the “Option for Expansion” in its contract to permit Los Angeles to transport an additional number of round trip passengers, at least equal to that number transported by Coastal. The Assistant Secretary of the Air Force for Materiel rejected this proposal.
42. On January 6, 1959, Arthur W. Purkel of MATS Headquarters sent to Los Angeles a telegram which stated, in part, as follows:
* * * PURSUANT & SUBJECT TO THE ABOVE REFERENCED CONTRACT, THE FOLLOWING AIR TRANSPORTATION SERVICES ARE ordered: PART 1. ATLANTIC AREA. TRANSPORTATION OE 144 PAX OUTBOUND & INBOUND FROM CHARLESTON AFB, S.C. TO NOUASSEUR & RETURN UTILIZING DC-6 AIRCRAFT. ACL PER flight: MINIMUM 84 PAX; MEAN 86 PAX; MAXIMUM 88 PAX. PERIOD OF PERFORMANCE: 19 THRU 31 DECEMBER 1958. COST PER PAX FROM CHARLESTON AFB, S.C. TO NOUASSEUR $107.54. FROM MOUASSEUR [sic] TO CHARLESTON AFB, S.C. $107.54. * * *
43. On July 2, 1959, Los Angeles submitted a claim to GAO in the amount of $50,999.16, for loss of profit resulting from failure of defendant to make timely award of a contract to Los Angeles. In the claim, Los Angeles sought either administrative payment of the amount claimed or, alternatively, a recommendation to the Congress for legislative relief by private bill. By decision dated August 13, 1959, the Assistant Comptroller General denied the claim and declined to recommend private relief legislation.
44. On September 14,1958, Los Angeles had accepted and formally executed an aircraft lease agreement, which had been drawn up on August 29, 1958, leasing a Douglas DC-6A, for a term' of 24 months, commencing October 1, 1958, at a rental of $23,500 per month. This was the plane Los An-geles originally planned to use to perform any contract received under IFB 11-626-59-3 CAB. By an aircraft lease agreement dated October 3, 1958, Los Angeles leased this plane to Slick Airways, Inc., for 12 months and 5 days, beginning September 25, 1958, and ending September 30, 1959, at a rental of $27,500 per month, and this lease agreement was performed by the parties.
*331 45. Following protests because of failure to receive a contract award, plaintiff leased a Douglas DC-6B, beginning November 2,1958, at a monthly rental of $23,500 per month. Plaintiff asserts that this airplane was leased in anticipation of performance of any contract which it might receive as a result of its protests. The record establishes that the aircraft was idle for a majority of the period from November 2 through December 18, 1958, and it was the same aircraft ultimately used by plaintiff in performing the contract awarded.
46. Plaintiff incurred expenses during the period of October 1 through December 18, 1958, other, than for maintenance, in order to insure the availability of a suitable aircraft to perform a contract which might be awarded to plaintiff after a protest was filed concerning the rejection of plaintiff’s bid under the Invitation For Bids. The expenses incurred were as follows:
Aircraft rental (Nov. 2-Dee. 18,1958)_[1] $35, 861.60
Insurance — ground only_ 2,972.26
Salaries — Maintenance and Pilots_ 3,920.73
General and Administrative Expenses_ 3,464.95
Total_ 46,219.54
47.Plaintiff expended the sum of $575 for gas and oil during the period of November 2 through December 18,1958, for starting up and running the four engines of the aircraft subsequently used in the performance of the contract herein involved for the purpose of checking the need for replacements and repairs, to dry out accumulated moisture which might cause corrosion, and generally to keep the aircraft in an airworthy condition. Defendant admits that this expenditure was made but denies any liability for the item. Plaintiff further expended the sum of $7,020.17 representing strictly maintenance costs incurred in the inspection, cleaning and repair of corrosion damage, repair of malfunctioning units, and other maintenance work, all of which was performed during the period of November 2 through Decem *332 ber 18, 1958, on the aircraft which was subsequently used in the performance of the contract here involved, which was essential and necessary in order to insure that said aircraft was kept in an airworthy condition, as it was when received on November 2, 1958. No portion of the sum of $7,020.17 was used for modification of the aircraft.
48. As a result of the action of defendant in awarding the contract to Coastal Cargo Company, Inc., during the period of October 1, 1958, to December 18, 1958, plaintiff Los Angeles claims it was deprived of profits it would have made on the 1,356 passengers transported during this period.
The record discloses that plaintiff maintained its accounts on a cash receipts and disbursements basis rather than on an accrual basis, and costs were not segregated as to a particular contract. This could cause a disproportionate assignment of income or costs or both during any month or selected period. Income would be entered when received, not when earned, and expenses entered when paid, not when incurred.
Upon audit it was determined there was a 3-month period, January through March 1959, in which plaintiff performed no business other than the contract in suit. From the evidence presented it appears reasonable to conclude that the month of March 1959 is fairly representative of plaintiff’s operations on this contract. During that month, plaintiff billed defendant for the transportation of 500 passengers in the amount of $107,540 and incurred costs for operating and administrative expenses in the amount of $105,286.58. Plaintiff’s net profit for this representative month amounts to $2,253.42 ($107,540.00-$105,286.58), or $4.51 per passenger ($2,253.42-f-500).
If plaintiff is entitled to lost profit on the 1,356 passengers transported by Coastal Cargo Company, Inc., during the period from October 1, 1958, to December 18, 1958, it is concluded that such loss of profit would not have amounted to more than $6,115.56 (1,356 X $4.51).
CotTNT II
49. Prior to sending the award telegram on December 18, 1958 (quoted in finding 40 above), Mr. Hinger discussed the award for December 1958 with Los Angeles. Los Angeles was given an alternative of being awarded a contract im *333 mediately or beginning in January of 1959 and was advised that there were only two more trips and 144 round trip passengers left for the month of December. Since it was eager to commence performance, Los Angeles elected to begin immediately.
Subsequent to the discussion, an award telegram was sent to Los Angeles, and followed up by the formal award of contract AF 11 (626)-84, dated December 19, 1958.
50. The formal award described, in typewritten form on the face of the award, the supplies or services to be rendered as follows:
Round Trip air transportation of 144 passengers for month of December 1958 and 500 passengers per month for months of January 1959 through September 1959 from Charleston AFB, South Carolina, to Nouasseur, Morocco at $215.08 per pax.
The award stated that the total contract price was $998,831.52.
51» The printed terms of the IFB directed the bidders to state a minimum, mean, and maximum Available Cabin Load (ACL) and provided that the mean ACL was to be considered as the Government’s guarantee. In regard to Item 7, the printed IFB read as follows (portions filled in by Los Angeles in submitting its bid are underscored):
ITEM 7. PASSENGERS ATLANTIC AREA
Type of Aircraft-DC-6A
Fleet Average. Bidder will submit one (1) ACL for each quarter.
■First Quarter (Oct. thru Dec.) Second Quarter (Jan. thru Mar.) Third Quarter (Apr. thru June) .Fourth Quarter (Jul. thru Sept.)
Minimum_18, 900
Mean_ 19,350 SAME SAME SAME
Maximum_19, 800
Guarantees
1. The bidder guarantees to transport the overall number of passengers per month listedbelow:
a. Based on Minimum ACL (Contractor’s guarantee) No. of passengers_588
*334 2. Based upon Mean ACL set forth above (Government’s guarantee) the bidder establishes the following total number of passengers_ 600 to be transported per month.
Price per passenger delivered roimd trip from Charleston AFB, South Carolina to Nouasseur and return-$215.08
NOTE: The Contractor agrees that the price per passenger delivered one-way will be one-half (y2) Round Trip price.
On January 6, 1959, the figures of “588” passengers and “600” passengers inserted in Los Angeles’ bid were corrected to read “500” passengers, this correction being initialed by the contracting officer and a representative of Los Angeles.
52. Los Angeles’ bid was based on a DC-6A plane, but the DC-6B which was ultimately used to perform was remodeled to accommodate 92 passengers. Both before the award telegram and later, on January 6, 1959, Los Angeles asked the Government to make use of the extra seats, but the Government declined to utilize the additional capacity since its requirement for commercial airlift services was 500 round trip passengers per month.
53. Los Angeles commenced performance under contract AF 11 (626)-84 on December 21, 1958. Los Angeles was paid for 144 round trip passengers in December 1958. Actually, fewer than 144 passengers were transported in December 1958.
5.4. Los Angeles offered to transport 86 passengers on each of the December flights, but the resident contracting officer at the Charleston Air Force Base declined to accept that offer because of the specific provision in the original award to Los Angeles for 144 round trip passengers for December 1958. The record does not support a finding that Los Angeles was informed by any representative of defendant that it would be paid for more than 144 round trip passengers for December.
55. On March 31, 1959, Los Angeles submitted a claim to the contracting officer at Headquarters MATS for $6,022.24 *335 for an additional 28 round trip passengers for December 1958. The contracting officer disallowed the claim, and an appeal was docketed with the Armed Services Board of Contract Appeals. Apparently this appeal was later withdrawn when Los Angeles and the Air Force agreed that this was a legal question for determination by GAO. On November 27,1959, Los Angeles submitted this claim to GAO, but plaintiff’s petition in the Court of Claims was filed before any action was taken by GAO.
On February 6, 1964, the court allowed plaintiff’s motion to amend Count II of its petition in order to claim an additional amount of $6,022.24 under the mean available cabin load (ACL) provision of the contract which, according to Note 3 on page 7 of the contract, provided that the mean ACL “shall be considered as the Government’s guarantee” subject to an offer to transport.
Count III
56. IFB 11-626-59-3 CAB provided:
A. Purchase of petroleum support by the Contractor at any military base for use in performing services hereunder shall be in accordance with the provisions of AFB 67-53 dated 1 July 1958 or as may be hereby amended. * * *
AFB 67-53 refers to an Air Force Regulation on the sale of aviation fuel and oil to civil, contract, and charter aircraft.
57. Up to December 23, 1958, the Air Force policy on the sale of gasoline and oil to contract and charter carriers was that the Air Force, not wishing to be in competition with private enterprise, would not sell fuel products to contract and charter carriers if there was a commercial refueling facility available and if the commercial facility was capable of serving such carriers, i.e., if the commercial facility could go to the military side of the airport or the carrier could taxi across the field to the commercial facility for refueling.
58. In 1958 and 1959, there was a commercial refueling facility, Hawthorne Flying Service, available at Charleston *336 Air Force Base. The commercial refueling facility could go to the military side of the airport to service contract and charter carriers.
59. Effective December 23,1958, AFR 67-53 was amended in regard to sales of gasoline and oil to contract carriers to provide as follows:
2. What the Sales Policy Is:
a. Air Force aviation fuel and oil will not be sold to civil and charter aircraft in competition with private enterprise. The Air Force will not furnish aviation fuel and oil to such aircraft where commercial refueling of commercial products is available. EXCEPTION: In some instances, commercial refueling is available on the same airport as Air Force facilities but airport safety regulations do not permit the commercial refueling operator to move his equipment to the Air Force refueling ramp or the aircraft to be taxied across the runways to the commercial refueling ramp. Under these circumstances, a charter or civil aircraft making an authorized stop at the Air Force installation is authorized to buy Air Force aviation fuel and oil.
b. Where commercial refueling is not available, the sale of Air Force aviation fuel and oil to aircraft mider charter agreement with the U.S. Government is permitted at, and limited to, points where passengers or cargo are loaded into or discharged from the aircraft. Sales to civil aircraft are governed by the conditions outlined in paragraph 4c.
c. The sale of Air Force aviation fuel and oil to aircraft under contract to any department of the U.S. Government is authorized without the restrictions placed on other aircraft in a andb above.
The preceding AFR 67-53 had provided:
2. Policy:
a. Air Force aviation fuel and oil will not be sold in competition with private enterprise to civil, contract, or charter aircraft. Therefore, the Air Force will not furnish aviation fuel and oil at locations where commercial products are available except as in b and c below.
b. Where commercial products are not available, the issue of Air Force aviation fuel and oil to aircraft operating under contract to the USAF and aircraft operating under charter agreement with USAF is permitted at, and limited to, points where passengers or cargo are *337 loaded into or discharged from the aircraft. In some instances commercial refueling facilities are available on the same airport as Air Force facilities but airport safety regulations do not permit the commercial refueling operator to move his equipment to the Air Force refueling ramp or permit the aircraft to be taxied across the runways to the commercial refueling ramp. Under these circumstances, if a contract or charter aircraft is making an authorized stop at the Air Force activity, the issue of Air Force aviation fuel and oil is authorized.
c. Issues of Air Force aviation fuel and oil to Air Materiel Command Logair aircraft are authorized in all instances. Therefore, they are exempt from the restrictions placed upon other charter and/or contract aircraft by a and b above, and d below.
60. Following the change in AFB 67-53 on December 23, 1958, Los Angeles made no request to the contracting officer to purchase gasoline and oil until August 1959. From August 1959 until the end of the contract period, Los Angeles purchased gasoline and oil from the Air Force at standard Air Force prices.
61. On September 17,1959, Los Angeles filed a claim with the contracting officer at MATS Headquarters for the difference between what it had paid for gasoline and oil at commercial prices up to August 1959, and what it would have paid at standard Air Force prices. Prior to rendering any decision, the contracting officer requested additional information, which apparently had not yet been furnished at the time this law suit was instituted.
62. It was stipulated by the parties that, for the period up to August 1959, the difference between what plaintiff paid for gasoline and oil at commercial prices and what it would have paid at standard Air Force prices was $10,507.54.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is dismissed.

 Subsequently, a trial on the merits was held. This led ultimately to a decision adverse to Heyer. We concluded that, since the plaintiff's sample had failed to meet the specifications, rejection of the plaintiff’s bid was not improper. 147 Ct. Cl. 256, 266.

 Finding 51, infra, pertains to the available cabin loads (ACL) which plaintiff indicated in its bid. Plaintiff’s mean available cabin load, 19,350 pounds, was the equivalent of 86 passengers per flight. (The weight allocable to an individual passenger was 225 pounds.) The invitation for bids designated the mean ACL as the “Government’s guarantee.”

 As indicated in finding 50, infra, the award described the subject matter of the contract as follows :
“Round Trip air transportation of 144 passengers for month of December 1958 and 500 passengers per month for months of January 1959 through September 1959 from Charleston APB, South Carolina to Nouasseur, Morocco at $215.08 per pas [passenger].”
The total price, which was stated to be $998,831.52, can be broken down as follows:
December 1958 (144 round trip flights at $215.08)_ $30, 971. 52
January through September 1959 (9 months, 500 round trip flights per month)- 967,860.00
Total-$998. 831. 52
Thus, it is apparent that the contract price supports defendant’s contention that plaintiff was to be guaranteed 72, not 86, passengers per trip for the flights made in December 1958.

 With the exception of the aircraft rental item, there is no disagreement concerning the amount of these expenses. If defendant is entitled to a credit for the profit from lease of the other plane to Slich Airways, the amount of that credit for this period is $11,024.50.