**C.J. BETTERS, CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 438–88 C.**

United States Claims Court.

Aug. 27, 1990.

Arthur R. Hessel, Washington, D.C., Atty. of Record, for plaintiff.

Odessa P. Jackson, with whom were Asst. Director Thomas W. Petersen, Director David M. Cohen, and Asst. Atty. Gen. Stuart M. Gerson, for defendant. Edward Eitches, Dept. of Housing and Urban Development, of counsel.

## OPINION

WIESE, Judge.

Plaintiff, C.J. Betters Corporation, was the successful bidder in a solicitation issued by the Department of Housing and Urban Development (HUD) inviting offers to purchase, on an "as is" basis, a rent-subsidized apartment complex in Pasadena, Texas. As the present owner of the complex, Betters is suing here to recover contract damages based on alternative theories of entitlement. In Count I, Betters asserts that HUD failed to satisfy its obligation, under the sale contract, to establish rental subsidies on behalf of the apartments' qualifying low income tenants on or shortly after

the date of sale. Betters, in Count II, alleges that HUD acted contrary to law in offering Continental Apartments for sale with tenant-based subsidies rather than project-based subsidies.

Defendant has moved for summary judgment on both counts; plaintiff opposes. The court, upon consideration of the parties' briefs and the oral arguments, concludes that defendant's motion should be granted only as to Count II. As to Count I, our determination favors the plaintiff.

## FACTS

In August 1986, HUD provided plaintiff with information pertaining to the proposed sale, by sealed bid, of a 284–unit, two-story garden-type apartment complex in Pasadena, Texas known as the Continental Apartments (herein also "the project"). This information, referred to as the "bid kit," included a Prospectus and Invitation to Bid (a summary of the property's pertinent details), a set of bidding instructions, a proposed contract of sale, and a "Section 8 Information" sheet describing the details of the tenant-based rental subsidy program under which the project was being sold. For purposes of this litigation, these documents constitute the entirety of the parties' purchase contract.[1]

HUD informed bidders, through the Section 8 Information sheet, that the rental subsidy would be tenant-based Section 8 Certificates of Family Participation (as opposed to project-based housing assistance payments). As to these certificates, the information sheet explained that:

[a]pproximately *128* tenants in this project have, or will have at closing or shortly thereafter, Certificates of Family Participation (Certificates) administered by a local public authority, usually the PHA [Public Housing Authority] having jurisdiction in the area where the project is located. The new owner will be required to execute a Housing Assistance Payments Contract (HAP) with the PHA administering the Certificates in order to receive subsidy payments. HUD, through an Annual Contributions Contract (ACC) with the PHA, provides funds to the PHA to make these payments.

The information sheet cautioned bidders that:

payments hereunder may not start for several months after closing, either due to repairs required by the purchaser, or the processing required to start the administration of the Certificates. Prior to receipt of the subsidy payments, purchasers may not charge eligible tenants, who will receive Certificates, more than the amount the tenant would be required to pay under the Certificate program. Bids should be computed accordingly.

In addition to informing bidders about the project's eligibility for tenant-based rent subsidies, HUD advised bidders that the property was being sold on an "as is" basis, *i.e.*, without any representations by HUD as to the project's state of repair, occupancy, or value. The pertinent contract clause reads as follows:

6. AS–IS SALE; NO REPRESENTATIONS

(a) Purchaser shall accept the Property "as is." Seller makes no representations or warranties concerning the physical condition of the Property. In addition, Seller does not represent or warrant the number and occupancy of revenue producing units, or any factor bearing upon the value of the Property.

(b) Purchaser acknowledges that the purchase price set forth in Section 2 is based on Purchaser's evaluation of the project and not upon any representations by Seller. Purchaser's failure to inspect, or to be fully informed as to any factor bearing upon the valuation of the Property, shall not affect the liabilities, obligations or duties of Seller under this Contract.

---

1. The incorporation of these documents into the purchase contract was accomplished by paragraph nineteen of the "contract of sale" which recited the purchaser's affirmation "that it has full knowledge of the terms, conditions, and requirements contained in this Contract, the Prospectus and the bid kit provided by Seller to Purchaser."

Nine bids were received by HUD, the highest being the bid of C.J. Betters Corporation in the amount of $1,035,000. A contract of sale was entered into on October 2, 1986 and the property closing was held on October 27, 1986.

On November 10, 1986, HUD notified the City of Pasadena Public Housing Authority—the authority administering the Section 8 certificates—that it would be receiving 130 certificates for existing housing, together with a contract reserving to the city $597,000 as source funds for the rent subsidy payments. Included in the letter was a list of the Continental Apartments' tenants thought to be eligible for the rental subsidies. The letter instructed the housing authority that "[t]he listed tenants will need to be certified by your agency" before contractual authority to expend funds could be finalized.

Certification of tenant eligibility proved to be a time consuming process. One of the chief difficulties which Betters encountered was the local housing authority's insistence that each of the living units be reinspected to assure compliance with HUD housing quality standards.[2] The housing authority believed that reinspection was necessary even though it had been advised by HUD in January 1987 (shortly before the certification process began) that all occupied units satisfied quality standards at the time of property closing. Not until June 1987—and then only because of HUD's insistence—did the reinspections cease.

At this time (i.e., June, 1987), HUD agreed that Betters should receive rental payments retroactive to the date of closing for all of the original tenants still in occupancy. However, during the preceding months, the company had been required by the local housing authority to undertake costly and disruptive apartment-by-apartment repair work, much of it unanticipated. In addition, there was a decline in occupancy—an occurrence which plaintiff attributes to the administrative delays and physical disruptions associated with the initiation of the housing subsidies. No tenants were certified until May 1987, some seven months after the date of closing. Betters began to receive rent subsidies on a limited number of dwelling units at that time. However, by the time rental subsidies did begin in May 1987, over seventy tenants had left Continental Apartments.

Betters filed suit in this court on July 25, 1988 claiming, among other things, that neither the need for tenant certification nor the necessity for extensive rehabilitation of occupied rental units had been disclosed in the bid package. More to the point, Betters claims that HUD personnel informed its representatives at the time of their site visit (prior to bidding) that there would be approximately 130 certificate-eligible tenants in residence at the time of closing, that the units occupied by those tenants would meet HUD housing quality standards at closing and that no other conditions for the issuance of the certificates would then remain to be satisfied by the new owner.

In light of these assurances, Betters contends that the delays and added costs which it experienced in the certification of the Continental Apartments' tenants amounted to a breach of contract on the Government's part. Secondarily, plaintiff maintains that HUD should have offered the apartment complex for sale with project-based subsidies rather than tenant-based subsidies and, on this ground, claims entitlement to the added revenue that a project-based subsidy would have provided.

## DISCUSSION

### Count I

The main grievance presented here—and the one we consider first—is Betters' contention that it suffered unreasonable delays and unanticipated costs in the administrative process establishing the Section 8 subsidy payments. Betters maintains that that process, as carried out under the aus-

2. These standards, which are codified at 24 C.F.R. § 882.109 (1989), enumerate the accepta-

bility criteria for Section 8 housing.

pices of the local housing authority, was unnecessarily protracted because it included a resurvey of subsidy payment requirements. Under Betters' understanding of the contract's representations, any resurvey either had been completed before the closing date or would be soon thereafter. To Betters then, the Government's acquiescence in the local housing authority's resurvey was a breach of contract.

▇ Two specific points make up the argument. To start with, Betters maintains that under the terms of the solicitation, it had a right to expect that the subsidy eligibility of the incumbent tenants either had been recently confirmed by the Government (and therefore would not need to be immediately reconfirmed by the local housing authority) or would be confirmed shortly after closing.

Plaintiff supports this assertion with the language of the Prospectus and Invitation to Bid and the wording of the Section 8 Information sheet. The Prospectus and Invitation to Bid told bidders that, as of June 30, 1986 (roughly 90 days prior to the planned bid opening), there were approximately 128 subsidy-eligible tenants in occupancy at Continental Apartments. The document explained that "upon the sale and closing of this property, or shortly thereafter, HUD will provide Certificates of Family Participation (Section 8 Certificates) to all Section 8–eligible tenants who are in occupancy at sales closing."

The Section 8 Information sheet contained the same message. This document outlined the mechanics of the rent subsidy program, including the need for periodic certification of a tenant's annual income. It then went on to state that "[a]pproximately *128* tenants in this project have, or will have at closing or shortly thereafter, Certificates of Family Participation (Certificates) administered by a local public authority, usually the PHA having jurisdiction in the area where the project is located."

Based on these two contract sources, Betters asserts that it reasonably assumed that whatever else the initiation of subsidy payments might require in terms of admin-

istrative processing, it would not require an extensive commitment of time after closing before tenant certifications were established.

That assumption proved wrong. The certification process was not nearing completion at time of closing. Indeed, it had not even begun. It was not until November 10, 1986, approximately two weeks after closing, that HUD first notified the local housing authority that "[t]he listed tenants [those thought to be eligible for rent subsidies] will need to be certified by your agency." As matters turned out, the certification process did not get started until early February of 1987 and by April of 1987 no more than ten tenants had been certified eligible for Section 8 subsidy payments. Payments for these tenants began in May 1987.

Plaintiff sees in this course of events a breach of contract by HUD. We do too. If words in a contract are to be understood according to their ordinary and everyday meaning, then Betters had good reason to assume that qualifying residents of the Continental Apartments would have their Section 8 certificates in hand by the end of November 1986—roughly one month after closing. That is the fair sense of the language used in the contract. HUD's statement that tenants in occupancy "have, or will have at closing or shortly thereafter" their Section 8 certificates, was clearly inaccurate given that the process necessary to validate such a statement had not even begun and, once begun, would be time consuming to complete. HUD's statement was inappropriate and misleading.

The Government disputes this conclusion. It points out that the same Section 8 Information sheet, which plaintiff cites, also contains a second paragraph cautioning bidders "that payments hereunder may not start for several months after closing, either due to repairs required by the purchaser, or the processing required to start the administration of the Certificates." This same paragraph goes on to say that "[p]rior to receipt of the subsidy payments, purchasers may not charge eligible tenants, who will receive Certificates, more than the

amount the tenant would be required to pay under the Certificate program." Based on the language of this second paragraph, the Government argues that Betters should have understood that certification of tenants would be a lengthy process and not one likely to have been completed by or shortly after closing.

The court disagrees with the Government's argument. The potential delay referred to in the second paragraph concerns the initiation of the payment process for tenants who have been certificated and not the initiation of the certification process itself. The second paragraph's reference to tenants "who will receive Certificates" refers to those tenants identified in the opening paragraph: the "approximately *128* tenants … [who] have, or will have at closing or shortly thereafter" Certificates of Family Participation. The initial receipt of certificates is not a part of the "administration of the Certificates." Indeed, if a tenant's receipt of a certificate were part of the administrative payment process, it would be impossible for a purchaser to identify those "eligible tenants" for whom a higher-than-Section 8 rental rate could not be charged pending the start of subsidy payments. The Government's interpretation distorts the language of the contract.

For the reasons stated, we conclude that HUD misrepresented the status of the tenant certifications.

■ We move on to plaintiff's second point. Betters had anticipated that, upon completion of a tenant's certification, subsidy payments would begin, subject only to the need for some administrative lead time. This is not what happened. Instead of initiating the payment process, the local housing authority insisted upon inspecting the apartment units to reaffirm that those units met the performance standards required under the Section 8 program, *i.e.*, the housing quality standards specified by HUD's regulations. Many of the units were judged inadequate; Betters was required to correct the deficiencies.

The resulting repair effort became a costly and unanticipated burden to plaintiff. Although Betters had planned from the outset to rehabilitate the entire apartment complex, it had anticipated a building-by-building sequence rather than the apartment-by-apartment repair effort it was ultimately forced to undertake. Indeed, Betters had anticipated that in units occupied by subsidy-eligible tenants no repairs would be required other than those that it had planned as part of its own renovation program.

In this connection, Betters' affidavits indicate that, at the time it was investigating the project—prior to bidding—it specifically asked the HUD-designated property representative about the state of repairs of the units occupied by the subsidy-eligible tenants. This representative responded that the units would meet required housing quality standards at the time of closing.

In light of HUD's representation, Betters asserts that HUD breached the sale contract either because it misrepresented the condition of the occupied units or, assuming no misrepresentation, because it waited until June of 1987 (over seven months past the closing date) before calling a halt to the local housing authority's insistence upon investigating conformance with housing standards that HUD had previously determined were met. In short, from Betters' point of view, the Government was either wrong on its facts or too late in its actions. In either case, Betters maintains the treatment it received at the hands of the local housing authority was not what it had bargained for.

In answering the argument, the Government states, as a preliminary matter, that it did not misstate any facts—the units did meet the required housing quality standards at time of closing. The Government argues that the difficulty plaintiff encountered was with the local housing authority's administration of the housing assistance payment program and that difficulty, defendant further argues, is not a matter for which the Government can be held contractually responsible.

The Government's main argument, however, is that given the contract's "as-is" clause, any statements regarding the physical condition of the apartments were nei-

ther intended to be promissory in character nor should they have been so understood. The Government emphasizes the sweeping language of the clause: "Seller makes no representations or warranties concerning the physical condition of the Property;" "Seller does not represent or warrant the number and occupancy of revenue producing units, or any factor bearing upon the value of the Property;" "Purchaser acknowledges that the purchase price ... is based on Purchaser's evaluation of the project and not upon any representations by Seller." It is this clause, says the Government, to which the court must look to define the terms of the parties' bargain and to gauge the significance of any oral statements on which plaintiff claims to have relied. The clause says "no representations," it means no representations.

■ We cannot endorse either of these arguments. To address first the argument based on the "as-is" clause, we would agree, of course, that where the parties to a writing have adopted it as a final expression of their intention, evidence of prior or contemporaneous agreements may not be introduced to contradict a term of that writing. *Restatement (Second) of Contracts* § 215 (1982). Thus, a clause which recites that the seller makes no representations or warranties concerning the physical condition of the property and that the purchase price of the property is based on the buyer's own assessment of its value is sufficient, in the absence of fraud, to preclude evidence of an express warranty. *Wilkinson v. Carpenter,* 276 Or. 311, 554 P.2d 512 (1976) (en banc). The integrity of written agreements demands this result.

This rule, however, has no application here. The representation that defendant deems superseded by the as-is clause—the statement to Betters that HUD housing quality standards would be met in the case of the Section 8 dwelling units—is neither an abandoned term of an antecedent understanding nor an unincorporated additional term. To the contrary, that statement is declarative of the conditions HUD must fulfill as a matter of law when disposing of a property, designated as a "lower income housing resource," whose incumbent Section 8-eligible tenants are being allowed to remain in occupancy. That is to say, satisfaction of HUD housing quality standards is a prerequisite to the receipt of Section 8 housing assistance payments.[3] Therefore, when HUD represents, in the Section 8 Information sheet, that approximately 128 tenants have, or will have shortly after closing, Section 8 Certificates of Family Participation, it simultaneously represents that the tenant dwelling units meet housing quality standards. The two go hand-in-hand; they are alternative expressions of the same thought.

This point is made clear in a June 1, 1984 memorandum from the Assistant Secretary for Housing—Federal Housing Commissioner to HUD's regional administrators, housing commissioners and counsels. The memorandum concerns HUD's foreclosure policy on projects involving HUD-held mortgages. Among the subjects dealt with is the provision of subsidies in the event HUD is outbid at the foreclosure sale.

The memorandum explains that, "in the event HUD is outbid at a foreclosure sale, Section 8 assistance will be offered to all eligible tenants whether or not the project was formerly subsidized and whether or not the family was receiving assistance prior to the foreclosure." The memorandum calls for HUD, acting together with the local housing authority, to convene a meeting of all tenants "to inform them of the pending foreclosure sale and of their rights under the Section 8 Existing Housing Program" including "their right to stay or move." The memorandum emphasizes, however, that "[i]n some instances, such as projects that do not meet HQS [Housing Quality Standards] ... the families should be advised that they will not be allowed to stay in the project if they want to receive Section 8 Existing Housing Assistance."

---

**3.** For purposes of the Section 8 tenant housing assistance program, "Existing Housing" is defined as housing that is "Decent, Safe, and Sanitary." 24 C.F.R. § 882.101(a), (b) (1989).

Housing is considered to be "Decent, Safe, and Sanitary if the requirements of § 882.109 [HUD housing quality standards] are met." 24 C.F.R. § 882.102 (1989).

In other words, *existing* compliance with housing quality standards is a prerequisite to permitting incumbent Section 8–eligible tenants to remain in occupancy when a lower income housing resource passes into private hands.[4]

Applying this requirement to our situation leads to two results. First, as we have already noted, HUD's representation that there are 128 tenants in occupancy who have, or soon will have, Section 8 certificates is equivalent to stating that the tenants' dwelling units meet housing quality standards. Second, having made such a representation part of the contract, established rules of contract interpretation dictate that we read that representation in harmony with the as-is clause to the extent it is reasonable to do so. *Krupp v. Federal Housing Administration*, 285 F.2d 833, 836 (1st Cir.1961) ("all provisions in an agreement, including disclaimers, are to be limited or construed, if possible, to avoid conflict with other provisions"); *see also Restatement (Second) of Contracts* § 203(a) (1982) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); *Uniform Commercial Code* § 2–316(1) (1989) ("[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other").

It poses no analytical difficulty to construe the disclaimers of the as-is clause as limited by the Government's parallel representation that 128 of the apartment project's 284 dwelling units would meet HUD housing quality standards as of the date of closing. Such an interpretation does no violence to the language of the as-is clause. Indeed, it is an interpretation entirely consistent with HUD's own views, as reflected in in-house documentation (HUD's property disposition questionnaire, Form 9650, which presents an economic analysis of various approaches to the disposition of Continental Apartments), as well as in outside correspondence (HUD's letter of January 21, 1987 to the Pasadena Housing Authority). In both of these sources, HUD is on record as saying that, at the time of sale, all occupied units will physically meet the housing quality standards required for Section 8. Consequently, narrowing the as-is clause to accommodate these assertions makes sense as a matter of intention as well as of language. Accordingly, to the extent that the Section 8 dwelling units failed housing quality standards, HUD stands in breach of contract.

There remains for consideration the Government's other argument which attempts to place the blame for the claimed deficiencies in housing quality standards upon the local housing authority. The short answer to this argument is that it is HUD that represented the housing quality standards of the Section 8 units; hence it is HUD that is responsible for any failure of the units to meet those standards. If the local housing authority was too rigorous in its interpretation of the housing quality standards and rejected units that ordinarily would have been regarded as satisfying those standards, HUD bears the responsibility for this problem.

HUD eventually did step in to stop the local housing authority from insisting upon the rehabilitation of units whose compliance with housing quality standards HUD had earlier certified. However, that intercession did not occur until early in June of 1987, more than seven months beyond the closing date. The action could hardly be considered timely. As a consequence of the Government's delayed action, Betters was obliged to incur repair costs which it had a contract right not to expect.

**4.** As noted, the June 1, 1984 memorandum is concerned with defining HUD's policies in respect to foreclosures on HUD-insured properties and therefore is not directly applicable to the property disposition in issue in this case. However, it is clear from the property disposition questionnaire which HUD prepared in prelude to its sale of Continental Apartments, that compliance with the Section 8 assistance directives of the June 1 memorandum is considered a regulatory requirement—one as applicable to the disposition of a property owned by HUD as to a property on which HUD held only a mortgage.

## Count II

 In addition to its contract arguments, plaintiff also raises the contention that, under HUD's property disposition regulations, a project such as Continental Apartments, which had become identified as a lower income housing resource by virtue of the income level of its tenancy, must be sold with project-based subsidies rather than tenant-based subsidies. Project-based subsidies, Betters explains, would have entitled it to permanent Section 8 subsidies for a 15–year period for up to all 284 units in Continental Apartments as opposed to the right to receive subsidies, conditioned on occupancy by qualifying tenants, for no more than 130 units. Betters' claim is that the disposition of Continental Apartments without project-based subsidies is a violation of law and that it is entitled to receive the project-based subsidies that are mandated by law.

We reject this argument. In deciding against plaintiff on this issue, we need not examine the question whether disposition of the Continental Apartments without project-based subsidies was a violation of statute or regulation. It is enough to say that plaintiff cannot insist, on the one hand, that HUD's disposition of Continental Apartments was not carried out in accordance with law, and, on the other hand, claim a contractual entitlement on the basis of that disposition. The contentions are inconsistent. The first denies the validity of the contract of sale; the second affirms it. Plaintiff cannot have it both ways.

Plaintiff should have raised its challenge at the bidding stage, not after it became the successful offeror and entered into possession. Having accepted the benefits of the contract, plaintiff is now estopped from contesting its validity. *See Cities Service Helex, Inc. v. United States,* 543 F.2d 1306, 1313–14, 211 Ct.Cl. 222, 234–36 (1976).

## CONCLUSION

For the reasons stated in this opinion, we grant the Government's motion for summary judgment as to Count II of the complaint. Plaintiff is not entitled to recover on Count II as a matter of law. As to Count I of the complaint, the Government's motion for summary judgment is denied. Although plaintiff has not cross-moved for summary judgment, our disposition of Count I is, in effect, a determination of liability in plaintiff's favor. Accordingly, future proceedings in this case shall proceed pursuant to Claims Court Rule 42(c).