### C.J. BETTERS CORP., Plaintiff,

### v.

### The UNITED STATES, Defendant.

### No. 438–88 C.

United States Court of Federal Claims.

Feb. 15, 1994.

Jerry R. Goldstein and Leonard A. White, Bethesda, MD, for plaintiff.

Anthony J. Ciccone, with whom were Asst. Atty. Gen. Frank W. Hunger, Director David M. Cohen, Asst. Director Thomas W. Petersen, Dept. of Justice, Edward Eitches, Dept. of Housing and Urban Development, Washington, DC, and Gloria Aldridge, Dept. of Housing and Urban Development, Houston, TX, for defendant.

## ORDER

(i)   GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION

(ii)  VACATING DECISION ON LIABILITY IN PLAINTIFF'S FAVOR

(iii) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

and

(iv)  DIRECTING ENTRY OF JUDGMENT DISMISSING COMPLAINT

WIESE, Judge.

This case is now before the court on defendant's motion for reconsideration. Defendant was invited to file this motion to address what the court saw as an irreconcilable conflict between the factual and legal basis supporting its initial decision on liability in plaintiff's favor and the theory of damages upon which plaintiff is now seeking to proceed. The court, having considered defendant's motion and plaintiff's opposition, and without oral argument,[1] now grants defendant's motion on the single ground addressed in this Order.[2]

### I

We begin by briefly summarizing the facts and history of this case. A solicitation issued by the Department of Housing and Urban Development (HUD) for the sale of a rent-subsidized apartment complex contained a statement—later incorporated into the contract of sale—that "This project is being sold with Section 8 rental subsidy.... Approximately 128 tenants in this project have, or will have at closing or shortly thereafter, Certificates of Family Participation ... administered by a local public [housing] authority." In an opinion issued in this case on August 27, 1990, *C.J. Betters Corp. v. United States,* 21 Cl.Ct. 378 (1990), this court held that the quoted language, read in light of HUD's regulations, was equivalent to an assertion that the tenants' dwelling units (those units housing the certificate-eligible tenants) satisfied HUD housing quality standards (HQS). And that assertion, the court's holding continued, amounted to a promissory representation that was not inconsistent with or defeated by the as-is clause which governed the sale of the property as a whole. "[E]s-

---

1. It is not this court's practice to render a decision on a substantive motion without affording counsel the benefit of oral argument. In this instance, however, oral argument would have been futile because plaintiff was made aware of the analytical impasse between its damages theory and the court's liability decision long before the Government's motion for reconsideration was filed, yet no timely change in position ever came about. *See* transcript of Pre-trial Conference of October 13, 1993.

2. Defendant presented a number of other arguments in favor of vacating the decision on liability that was entered in this case on August 27, 1990. These arguments have been considered and rejected. They are not discussed further in this Order.

tablished rules of contract interpretation dictate that we read that representation in harmony with the as-is clause to the extent it is reasonable to do so." 21 Cl.Ct. at 384.

The court went on to decide that the local housing authority's insistence upon dwelling unit repairs as a condition to the issuance of the Section 8 certificates amounted to a breach of the HQS representation by HUD either because the dwelling units were not as represented (*i.e.*, failed to satisfy housing quality standards) or because HUD acquiesced in a too-rigorous interpretation of those standards by the local housing authority. In either case, plaintiff had been damaged because it was obliged to undertake apartment repairs which it could reasonably have expected not to experience and because it suffered an unreasonable delay in obtaining the flow of rental income which the Section 8 certificates were meant to provide. Accordingly, the court held that HUD was liable to plaintiff for a breach of warranty.

The case was returned to the parties with a view to their achieving a satisfactory resolution of the damage issue on their own. However, that expectation was never realized. Instead, disagreement between them as to the proper measure of damages led to their filing of cross-motions for partial summary judgment. The court addressed these motions—denying both—in an opinion issued on April 17, 1992. · *C.J. Betters Corp. v. United States*, 25 Cl.Ct. 674 (1992).

In this second *Betters* opinion, the court stated that the first step in the damages calculation "is to determine the value of the Government's promise, *i.e.*, the market value of the apartment project plaintiff had contracted to purchase." This market value might be equal to or greater than the purchase price. "The next step," said the court, "involves a calculation of the market value of the building the Government delivered. It is the difference between what was promised and what was delivered that establishes the amount of plaintiff's damages." Finally, the court added that "[i]n addition to the loss in value (established by market criteria), plain-

tiff is also entitled to recover incidental or consequential damages." 25 Cl.Ct. at 677–78.

The court's two decisions in this case ostensibly laid the framework for plaintiff's pretrial Memorandum of Contentions of Law and Fact (pertaining to damages), filed July 29, 1993. The court now finds, however, that Betters' claim for damages, as outlined in this memorandum and as further explicated at the pretrial conference held on October 7, 1993, is both factually inconsistent with Betters' earlier statements regarding its interpretation of the contract's terms and fundamentally at odds with the legal theory upon which the court's \decision on liability was based.

*Plaintiff's Current Position*

■ Plaintiff's pretrial memorandum presents the argument that the HQS representation as to the 128 (elsewhere quoted as 130) dwelling units had implications for the condition of the apartment complex as a whole. Thus, plaintiff states:

> Implicit in HUD's representation that 130 units complied with HQS was the corollary representation that the *building structures* and systems in which these 130 units were situated also complied with HQS (i.e., the unit inside the building *cannot* by definition comply with HQS if the building roof leaks, if the common utility systems are inoperative, [etc.] ).

Plaintiff continues:

> "Unit HQS" is not severable from "building and common facilities HQS." Betters reasonably relied upon the Government's warranties in determining the worth of the Property when it made the competitive bid.[3]

Finally, plaintiff alleges that Betters and HUD were of one mind as to this issue: "Given its knowledge of the HUD regulations, the Government always understood and intended their warranties as to 'HQS' to include the building operation 'systems' which serviced the 'HQS' units."

---

**3.** Plaintiff stated at the pretrial conference that it would not include repairs for "common area

amenities" in its damages.

## II

*Factual Inconsistency*

Plaintiff's current assertions as to how it interpreted the contract language at the time of contract formation are in open conflict with statements made by its attorney at an earlier stage in this case. Because these earlier statements were vital to this court's finding that the as-is clause and the HQS representation could be read as consistent, plaintiff's new version of events undermines that finding's validity.

The earlier statements to which we refer were made at the February 6, 1990 oral argument on the question of liability. Near the close of that argument, Arthur Hessel, then counsel for plaintiff, attempted to describe Betters' state of mind in regard to the contract and the condition of the buildings. Counsel began by emphasizing the modesty of Betters' expectations: "Mr. Betters believed and his organization believed that they were buying what was clearly a very troubled project, that they were going to put a lot of money into repairs, which they have." Tr. at 111.

Mr. Hessel then presented what he stated to be Betters' view of the as-is clause and its interaction with the promise of Section 8 certification. It should be noted that Mr. Hessel mentioned the status of building systems—such as heating, roofing, and plumbing—several times during his oral argument. In each instance he emphasized that Betters did not expect functioning systems. In regard to the as-is clause, he explained: "[I]t was one of a number of clauses in a contractual arrangement that in the mind of Betters, perhaps, meant that they couldn't look to the Government if, after they bought it, the heating didn't work." *Id.* at 115. Furthermore, according to Mr. Hessel, Betters had never said to HUD "you have sold me a building that is less than you said, therefore pay for the new furnace or the new windows or the new roof." *Id.* at 117.

Mr. Hessel's most important contribution to this court's reading of the contract was his explanation of how the as-is clause and the Section 8 certification promise could be read as consistent. Mr. Hessel argued:

There are two parts to this contract. Betters was buying two things. Maybe you should look at it this way. They were buying a project, a piece of real estate, ground and buildings in bad shape, from the government which was selling it as is, and that is not at issue.

They were also buying, they thought, the income stream from Section 8 certificates for the benefit of 130 of their residents, assuming they could hold them in their apartments.

*Id.* at 122. Thus, Mr. Hessel differentiated between "the physical real estate," *id.*, which was the subject matter of the as-is clause, and the income stream, which was the subject matter of the HQS representation.

In its opinion of August 27, 1990, the court drew upon Mr. Hessel's remarks in concluding: "It poses no analytical difficulty to construe the disclaimers of the as-is clause as limited by the Government's parallel representation that 128 of the apartment project's 284 dwelling units would meet HUD housing quality standards as of the date of closing." 21 Cl.Ct. at 384.

Mr. Hessel's explanation of how Betters viewed the contract terms clearly is at odds with the explanation presented by plaintiff's current counsel. Under Mr. Hessel's version, the HQS representation limited, but did not eviscerate, the as-is clause. Under the current version, in contrast, the HQS representation has such wide-ranging effect that it renders the as-is clause bereft of any meaning. This shift has significant legal consequences, which we discuss below.

*Legal Inconsistency*

Betters' current version of the facts makes it impossible to reconcile the HQS representation with the as-is clause. The difficulty arises from plaintiff's assertion that the HQS representation was always understood as a warranty that the building systems would be in acceptable working order. That is, plaintiff now claims to have believed, at the time of contract formation, that both the HQS and non-HQS units would have adequate heat, electricity, plumbing, roofing and so forth. Taken to its logical conclusion, this view implies that the HQS representation affected

substantially all of the physical real estate.[4] It follows that there was no separable entity to which the as-is clause might have any independent application.

It is clear therefore that, under plaintiff's reading of the contract, the as-is clause effectively disappears. That is an unacceptable result. Plaintiff cannot blithely read the as-is clause out of the contract. "It is axiomatic that, in order to determine the meaning of a contract, one must look to the entire instrument." *Trans International Airlines, Inc. v. United States*, 173 Ct.Cl. 312, 315, 351 F.2d 1001, 1003 (1965). "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." Restatement (Second) of Contracts § 203(a) (1979).

▪ In addition, the broad reading of the HQS representation that plaintiff now espouses put it on notice that the contract contained a fundamental contradiction. The as-is clause meant that the seller made no warranties as to the condition of the property; yet the HQS representation, in Betters' view, guaranteed that the building systems would be in adequate working order. This inconsistency "was not subtle, hidden, or minor but patent, blatant, and significant"; thus, plaintiff had a duty to seek clarification. *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 130, 546 F.2d 367, 370 (1976). The reasons for imposing such a duty were set forth in *S.O.G.*:

> The rule that a contractor, before bidding, should attempt to have the Government resolve a patent ambiguity in the contract's terms is a major device of preventive hygiene; it is designed to avoid ... post-award disputes ... by encouraging contractors to seek clarification before anyone is legally bound.... In addition to its role in obviating unnecessary disputes, the patent-ambiguity principle advances the goal of informed bidding and works toward put-

ting all the bidders on an equal plane of understanding so that the bids are more likely to be truly comparable. Conversely, the principle also tends to deter a bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid (based on the less costly reading) with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials take the other view after the contract is made.

*Id.* at 131, 546 F.2d at 370-71.

Plaintiff asserts that it satisfied any arguable duty to inquire prior to submission of its bid. In this connection, it refers us to the affidavit of Michael Hiltz, Chief Executive Officer for Betters. Mr. Hiltz describes a conversation with the HUD-designated property representative, who informed him that the units occupied by subsidy-eligible tenants—approximately 130 units—met HQS and would meet HQS at the time of closing.

We do not view this conversation as a sufficient inquiry. The affidavit makes no mention of a discussion of the conflict between the as-is clause and the now broadly-read HQS representation. Nor does the affidavit address the fact that the contract specifically stated that "the purchase price ... is based on Purchaser's evaluation of the project and not upon any representations by Seller." Thus, the conflict at hand was neither addressed nor resolved prior to bidding. Having failed to seek clarification of the conflicting contractual provisions, plaintiff has no basis for now asserting that its reading of the contract is correct. Hence, plaintiff is not entitled to recover.

### III

For the reasons stated above, defendant's motion for reconsideration is granted and the decision on liability entered August 27, 1990 is vacated. Consistent with these actions,

---

4. In its Opposition to Motion for Reconsideration, filed December 8, 1993, plaintiff states: "Betters does *not* contend that the contractual representation that 128 units in the Projet [sic] would meet HQS was a warranty that all of the *buildings and amenities* in the Project would meet HQS." Nonetheless, plaintiff argues that damages should include the costs of repairing building systems, or, at the very least, the percentage of such costs as may reasonably be assigned to the HQS units. Thus, plaintiff clearly views the effects of the HQS representation as extending beyond the 128 or 130 units in question.

the court now grants, in full, defendant's initial motion for summary judgment, filed April 26, 1989. Accordingly, the Clerk shall enter judgment dismissing the complaint for failure to state a claim upon which relief can be granted.